MADELEINE M. LANDRIEU, Judge.
hThe defendant, Carlos Vargas-Alcerre-ca, appeals his convictions of attempted forcible rape and simple kidnapping, and his sentences of seventeen years at hard labor and five years at hard labor, respectively. For the reasons that follow, we *571 affirm the defendant’s convictions and sentences.

STATEMENT OF THE CASE

Mr. Vargas-AIcerreca was charged by grand jury indictment on December 9, 2010, with three counts: (1) aggravated rape, a violation of La. R.S. 14:42; (2) second degree robbery, a violation of La. R.S. 14:64.4; and (3) second degree kidnapping, a violation of La. R.S. 14:44.1. He pled not guilty, and the trial court denied his motion to suppress the evidence.
On September 14, 2011, the trial court granted the State’s motion to present evidence of other sexual acts by the defendant pursuant to La. C.E. art. 412.2. It also granted Mr. Vargas-Alcerreca’s motion for a continuance of the trial date. This court denied the State’s writ application as to the continuance, but the Louisiana Supreme Court reversed, thus reversing the trial court’s granting of the continuance.[1] Mr. Vargas-AIcerreca also sought review of the merits of the trial 1 ¡.court’s ruling admitting the La. C.E. art. 412.2 evidence, and on September 20, 2011, this court denied his writ and request for a stay.[2]
Mr. Vargas-AIcerreca was tried by a twelve-person jury on September 20-23, 2011, and found guilty of attempted forcible rape (Count One) and of simple kidnapping (Count Three), but not guilty of second-degree robbery (Count Two). On November 22, 2011, the trial court denied Mr. Vargas-Alcerreca’s motion for new trial. Mr. Vargas-AIcerreca was sentenced to seventeen years at hard labor for attempted forcible rape, and five years at hard labor for simple kidnapping, both sentences to run concurrently. He filed a motion for an out-of-time appeal, which was granted on March 21, 2012.

FACTS

Mr. Vargas-AIcerreca was convicted of the August 28, 2010 attempted forcible rape and simple kidnapping of M.V.[3]
In August, 2010, M.V. and her friend M.A. travelled from Paris, France, where they lived, to New Orleans to visit M.A.’s aunt. M.V. testified that she was twenty years old and in her second year of university, and had been nineteen years old at the time of the alleged assault. On the night in question, M.A.’s aunt dropped M.V. and M.A. off on Frenchmen Street, where they intended to go to some bars together and then take a cab back to the aunt’s home. M.V. had her camera with her, but did not recall whether she had a phone. M.V. testified that they first went to Laziza, a Latino bar, where she drank a screwdriver. M.A. introduced her to Mr. Vargas-AIcerreca, whom M.A. had met when she had gone ^outside to smoke a cigarette. Mr. Vargas-AIcerreca spoke English, Portuguese, and Spanish, and was wearing a New Orleans Saints jersey, which M.V. identified in court. Her initial impression of Mr. Vargas-AIcerreca was that he was shy and nice. Mr. Vargas-AIcerreca was drinking with them. After being in Laziza for approximately thirty minutes, the three of them went to another bar, the BMC, at the suggestion of Mr. Vargas-AIcerreca. Mr. Vargas-AIcerreca asked M.V. to give him a kiss, and when she got close to his cheek, he turned his head to kiss her on her lips. She testified *572 that she did not want to kiss him on his lips, had no romantic or sexual interest in him, and was not physically attracted to him.
The three went to a third bar, where M.V. danced with another man. She testified that while she was dancing, Mr. Vargas-Alcerreca kept coming to her to tell her that M.A. was at the bottom of the steps leading to the bar. He subsequently told M.V. that M.A. had left and gone to another bar. She believed him at the time. He asked her to follow him so they could meet M.A. She followed him to the end of a street, where he stopped and was looking around. M.V. said she then began to feel that she was in danger and started running the other way. Mr. Vargas-Al-cerreca ran after her and caught up with her. She said her memory was a little fuzzy, but she eventually found herself on the ground with Mr. Vargas-Alcerreca on top of her. He hit her in the face with his fists about ten times and while hitting her, he penetrated her. Mr. Vargas-Alcerreca then fled, and a gentleman named Eric Gordon helped her.
At the hospital, M.V. discovered that her camera was missing from her purse. She thought she had taken perhaps ten photographs of Mr. Vargas-Alcerreca that night. She said she had black eyes and that her face was twice its normal size. She also had a small fracture in her nose and a bump for about a|4month. After the incident, M.V. lost her self-confidence and went through a depression. She purchased some mace because she was scared every time she was alone on the street. She identified Mr. Vargas-Alcerreca in court, and she denied that she had consented to having sex with him.
M.V. was shown some photos that her friend M.A. had taken that night. M.V. admitted they all had gotten close together to take the photos. She confirmed that she had chosen to sit at a table with Mr. Vargas-Alcerreca at the second bar rather than staying with M.A. At the third bar, she went to the bathroom before she began dancing with the other man; therefore, when Mr. Vargas-Alcerreca told her M.A. had left the bar, she did not know that M.A. had actually just gone out on the balcony. M.V. denied that she had been affectionate or amorous with Mr. Vargas-Alcerreca in the third bar, saying that she and M.A. behaved like that with everybody during the entire vacation, boys and girls.
When cross-examined, M.V. testified that she had consumed about five drinks, and did not remember telling the EMT that she had been beaten and raped in a bar; nor did she remember telling the Sexual Assault Nurse Examiner [“SANE”] that she had only two drinks. When questioned about her resistance, she testified that if she had continued to fight Mr. Vargas-Alcerreca, he would have just continued to hit her. When questioned about her injuries, she acknowledged that she had no bruises on her inner thighs or on the front of her thighs. She testified that before she lost consciousness, she saw Mr. Vargas-Alcerreca take something out of her purse. She then lost consciousness and woke up to see Eric Gordon, who called 911.
M.A. generally corroborated M.V.’s testimony in terms of the events that occurred on the night in question, including that M.A. met Mr. Vargas-Alcerreca Iswhen she stepped outside of Laziza to smoke and asked him for a cigarette, and that he was wearing a Saints jersey. She further testified that he spoke Portuguese, as did her friend M.V. M.A. was not frightened of Mr. Vargas-Alcerreca. She did not remember him drinking at this first bar. She was not attracted to Mr. Vargas-Alcerreca romantically or sexually. The three of them were at the first bar *573 between one and two hours before leaving to go to the second bar. On the way to the second bar, Mr. Vargas-Alcerreca suggested they go to his place, but the two women refused. At the second bar, the name of which she did not recall, both she and M.V. had another drink. Mr. Vargas-Alcerreca apparently was drinking beer, as M.A. noted that he was holding a beer bottle in several of the photos she had taken. M.A. was sitting at the bar, while Mr. Vargas-Alcerreca and M.V. were sitting at a table right behind her, talking. She said Mr. Vargas-Alcerreca was trying to pick up M.V.
According to M.A., when she and M.V. left the second bar, Mr. Vargas-Alcerreca kind of tagged along, uninvited. M.A. said M.V. was not showing him any romantic attention or making any sexual advances toward him. At the third bar, M.V. danced with a couple of other males but not with Mr. Vargas-Alcerreca. M.A. stated that Mr. Vargas-Alcerreca seemed jealous, but that M.V.’s response indicated that she did not care about him. They were at the third bar for less than an hour when M.A. and M.V. became separated because M.V. went to the bathroom, and M.A. went out on a balcony, where she could not be seen from inside the bar. While she was out there, someone from the bar came out to tell her the bar was near its closing time. M.A. went back inside and looked for M.V. but could not find her, even with a couple of people assisting her in the search. She | nthen went outside and walked up and down the street twenty times screaming M.V.’s name.
M.A. said she knew M.V. would not have taken a cab without her. She looked for M.V. for what she estimated was probably over an hour before returning to her aunt’s home at approximately 5:00 a.m. M.V. was not there. M.A. went back out and walked to the streetcar, thinking that M.V. might return by streetcar. She went back to her aunt’s home, and she and her aunt’s friend, Brian, left in Brian’s car to return to Frenchmen Street. While they were on their way, M.A.’s aunt called to tell her that M.V. was in the hospital. They went to the hospital, where M.A. found M.V. to be hardly recognizable due to the bruising and swelling.
M.A. estimated that she and M.V. had each consumed three to four drinks that night. She testified that both she and M.V. had cameras with them that evening. M.A. identified eight photos she had taken which were introduced into evidence. She said the photos simply memorialized some people spending an evening together. When further questioned about some of the photos, M.A. acknowledged that M.V.’s forehead was touching Mr. Vargas-Al-cerreca’s cheek in one photo and her head was touching his shoulder in another photo.
New Orleans Police Department [“NOPD”] Detective Clifton Neely, assigned to the sex crimes division in August 2010, responded to the rape call at Decatur and Mandeville Streets. He wrote the incident report in the case. He identified crime scene photographs. The victim, M.V., was not at the crime scene when Det. Neely arrived because she had been transported to University Hospital to obtain treatment for her injuries and to undergo a sexual assault examination. He met with her at the hospital. She indicated that she could identify her assailant. 17Pet. Neely obtained eight photos from the SD card from a camera belonging to the victim’s friend, M.A. The detective identified the photos, including one he had shown to M.V. that she had signed on the back at approximately 4:30 p.m. on the day of the assault. Det. Neely testified that the photo was of Mr. Vargas-Alcerreca.
*574 Det. Neely obtained an arrest warrant for Mr. Vargas-Alcerreca and a search warrant for Mr. Vargas-Alcerreca’s apartment. At the apartment the police found a New Orleans Saints Drew Brees Number Nine jersey and a copy of Mr. Vargas-Alcerreca’s lease, dated August 27, 2010. Det. Neely identified a number of crime lab photos taken at Mr. Vargas-Alcerre-ca’s apartment, including close-ups of the Saints jersey and a “sticker pod” attached to its sleeve[4] — he explained that the victim’s dress had been covered in similar sticker pods. A silver chain and cross were seized from Mr. Vargas-Alcerreca’s person when he was arrested. He said Mr. Vargas-Alcerreca was wearing a silver chain in one or more of the photos taken before the assault, as well as a Saints Drew Brees jersey. Also seized from Mr. Vargas-Alcerreca at the time of his arrest were the keys to his Houma Blvd. apartment and an apartment complex pool pass. None of the victim’s property was found in Mr. Vargas-Alcerreca’s apartment or car. The victim’s camera was never recovered in the case.
Det. Neely testified that he took a buccal swab from Mr. Vargas-Alcerreca’s mouth, pursuant to a search warrant. He then requested a DNA comparison of the |sswab to evidence from the victim’s sexual assault kit, which evidence he had directed the SANE, Winoka Banks, to collect and preserve.
Det. Neely testified that when he first saw the victim at University Hospital the morning of the assault, both of her eyes were “basically” swollen shut, the bridge of her nose had an obvious deformity, and her lips were swollen. She was angry, upset, and crying intermittently. The detective identified photos of the victim, in-eluding her shoulder and scraped knees. He also identified the dress worn by the victim on the night of the assault. Det. Neely confirmed that when Mr. Vargas-Alcerreca was taken into custody within three days after the alleged assault, he did not see any bruises, scrapes, or scratches on Mr. Vargas-Alcerreca’s hands, knuckles, or fingers.
Det. Neely said that he had not needed an interpreter to interview M.V. because she spoke English well enough so that anybody could understand her. M.V. and M.A. were not sure whether the bars they visited that night were on Bourbon Street or Frenchmen Street. The scene of the alleged assault was at least three blocks from the Frenchmen Street bars. Det. Neely did not request camera footage from any of the bars in the area. He did not know exactly how many drinks M.V. and M.A. had consumed that night.
Lori Flick, a paramedic with New Orleans EMS, testified that she received a call for service at Elysian Fields Avenue and Decatur Street on August 28, 2010, at approximately 4:30 a.m. A female was standing on the corner with a black male. The female said she had been sexually assaulted, and the black male had called 911 for her. The victim said her attacker had punched her in the face several times and had slammed her face on the ground. Ms. Flick testified that the victim’s face was swollen; her eyes and nose were swollen; she had blood coming |3out of both nostrils; and she was very distraught. Aside from those conditions, Ms. Flick noticed no abrasions, hematomas, scratches, or fist marks on the rest of the victim’s head, forehead, cheeks, or chin. Ms. Flick testified that she had seen many assaults (she had been a paramedic for seventeen *575 years), and said it appeared to her that the victim had been punched or assaulted by being hit with something. Ms. Flick identified a photo of M.V., the victim. Ms. Flick noted in her report in the matter that M.V. was alert and oriented as to person, place, time, and event. She had no slurred speech or altered gait. And, although M.V. said she had consumed alcohol, she showed no signs of clinical intoxication. Ms. Flick transported M.V. to University Hospital.
Winoka Banks, R.N., an advanced registered nurse, family nurse practitioner and SANE, was working at University Hospital when M.V. was brought to her in the emergency room. Ms. Banks testified that M.V. was very upset, was crying hysterically, and was saying repeatedly that she had been raped. M.V. related that she had met a Hispanic male in a bar and that they had two drinks. M.V. said that she had become separated from her friend with whom she had gone to the bar, and the man had told her he was going to take her to her friend. They left the area, and he pulled her into a dark area and sexually assaulted her. M.V. was awake, alert, and oriented during the sexual assault examination performed on her by Ms. Banks. The nurse found a cut on M.V.’s lip, scratches on her neck, scratches on her hand, abrasions to her knees, and abrasions to her ankles. There was swelling to her lips and nose. M.V. had abrasions on her left shoulder and had tenderness when Ms. Banks touched the back of her head.
Ms. Banks was qualified as an expert in the field of conducting sexual assault examinations. She testified that a female anatomical diagram she had made | innotations on during her examination of M.V. showed tenderness in the entry to the vagina, but apparently no tears to the cervix, the outside of the vagina, or the rectal area. Ms. Banks testified that one would not always expect to see tearing or redness in the case of a vaginal, penile rape because the vagina lubricates itself whether the sex is consensual or noneon-sensual. She stated that M.V.’s sole complaint was tenderness in the area of inner vaginal lips Ms. Banks conducted a skin examination for evidence of bodily fluids using a “Woods Lamp” or alternative light source, but found nothing.
Ms. Banks identified photos she took of M.V.’s injuries. She identified the sexual assault kit box containing the victim’s underwear, a vaginal swab, and a completed form. She noted that the victim’s underwear did not appear to be torn, ripped, or stretched out of shape.
Ms. Banks testified that she could not say whether a rape occurred; she could only say what she saw. She testified that it was reasonable that the injuries she observed were consistent with M.V.’s account of what happened.
NOPD Crime Lab Criminalist Korye DeLarge performed the testing of the victim’s underwear and of the vaginal swab taken from her. It was stipulated by the State and defense that testing of a one-centimeter cutting of the underwear revealed seminal fluid, and that a microscopic analysis of that seminal fluid showed spermatozoa. Ms. DeLarge testified that she could not make any determination, based on her testing, as to whether the sexual relations on the night in question were consensual or nonconsensual.
Louisiana State Police Crime Lab forensic scientist Andrew Ingram was qualified by stipulation as an expert in the analysis and determination of DNA evidence. Mr. Ingram said he tested two fractions from the cutting of the victim’s | n underwear and a reference buccal swab from Mr. Vargas-Alcerreca. The DNA profile obtained from one fraction of the underwear was consistent with being a mixture of DNA *576 from two individuals, a male and a female. The victim and Mr. Vargas-Alcerreca could not be excluded as contributors of the DNA in that mixture.
Mr. Ingram opined that the odds were 492 trillion to 1 that the male DNA in the mixture on the victim’s underwear was from any male other than Mr. Vargas-Alcerreca. Subsequent to completing his initial report, Mr. Ingram repeated the test. The results were the same, with the same statistical probabilities.
However, Mr. Ingram also testified that the vaginal swabs taken from the victim at the hospital contained no male DNA. All of the markers on the vaginal swabs matched the DNA of the victim.
Don Hancock, a telephone supervisor for the Orleans Parish Sheriffs Office, identified three CD audio discs of phone calls made by Mr. Vargas-Alcerreca from jail. Relevant portions of the calls were played for the jury without objection by Mr. Vargas-Alcerreca. Rebecca Martin, a Spanish interpreter/translator, confirmed that she had been hired by the State to translate the calls from Spanish to English. Ms. Martin identified transcripts of portions of two calls. In the first transcript, Mr. Vargas-Alcerreca admitted to punching M.V. and to her falling to the ground on her face. He said he broke her nose. However, he said they were going to set him free because he never put his penis inside her. He said the doctor was “going to check, because there was no penetration .... ” He further commented, “[tjhen after, I came and everything....” He said that he left when he saw M.V.’s face because he thought she had a broken nose. In the second transcript, Mr. Vargas-Alcerreca said that he did not think M.V. would come to New Orleans [to testify], |1gbut that if she did, it was going to be a fight because it was his word against hers, and that “they [the police] don’t have medical reports that penetration has taken place.”
Eric Gordon testified that he played a trumpet for a living and often played on Frenchmen Street. On the night in question he parked his truck around 8:00 or 9:00 p.m. and went to a club he referred to as the “Maison.” Mr. Gordon did not drink that night. He left the club at around 4:00 a.m. the next morning to return to his truck. When he was between Elysian Fields Avenue and Marigny Street, he witnessed a female run out onto Decatur Street from Mandeville Street, screaming “[h]elp, help, help.” A male followed and pulled her back onto Mande-ville Street. Mr. Gordon said he stopped, anticipating a confrontation, and called a friend back at the “Maison” to come and assist him. That friend never came to his aid.
Mr. Gordon then slowly proceeded up the middle of Decatur Street, being cautious as he was unarmed. When he got to the corner of Mandeville and Decatur Streets, he saw M.V. on ground with her legs open and dress up; the male was between her legs and on top of her, beating her in the face. Mr. Gordon said he saw the male’s elbow draw back “maybe three or four times.” M.V. was constantly yelling help. The male was wearing a Drew Brees jersey. When Mr. Gordon approached, he thought M.V. noticed him. The male then looked up, appeared shocked, and ran off down Decatur Street, turning right onto Marigny Street. Mr. Gordon started to run after him, hesitating a moment to advise M.V. that he was calling 911.[5] Mr. Gordon said he ran up to *577 and turned onto Marigny |13Street, but then returned to M.V. He and M.V. relocated to the better-lit corner of Elysian Fields Avenue and Decatur Street to await the police and an ambulance. He said there was blood all over M.V.’s swollen face. Mr. Gordon said M.V. told him that the male had raped her.
Another witness, M.B., testified as to a prior incident involving Mr. Vargas-Al-cerreca. M.B. identified Mr. Vargas-Al-cerreca in court. She testified that in January 2009 she was living in Buras, Louisiana, when she met Mr. Vargas-Al-cerreca for the first time at Alexis’s Lounge, where she was drinking with a friend who lived with her in her trailer and who was employed at the lounge. M.B. stayed at the lounge for approximately five hours, waiting for her friend to close up. Mr. Vargas-Alcerreca left with M.B.’s friend and they went to M.B.’s trailer, where Mr. Vargas-Alcerre-ca spent the night because he was too intoxicated to drive. M.B. left her friend and Mr. Vargas-Alcerreca in the living area, where there was a sofa, and she went into her master bedroom, changed into some pajama boxer-type shorts and a t-shirt, and went to bed. Before M.B. fell asleep, Mr. Vargas-Alcerreca entered her bedroom, complaining that the bed was too small in the living area. M.B. replied that it was not her problem. Mr. Vargas-Alcerreca left, and M.B. fell sound asleep, only to awake between 8:00 and 10:00 a.m. on her stomach, with Mr. Vargas-Alcerreca on top of her. He had his hand on the back of her neck holding her down and was penetrating her with his penis. She did not consent to this sexual contact. M.B. said she was able to get Mr. Vargas-Alcerreca off of her and told him to stop, and then she got up.
|UM.B. admitted to having prior felony convictions in Jefferson Parish for possession of two different controlled dangerous substances. M.B. said she had reported the assault a few days after it had occurred. She said she had not called out to her friend during the assault. She denied having flirted with Mr. Vargas-Alcerreca while at the lounge the night before the assault.

ERRORS PATENT

A review of the record reveals one patent error, which was raised by Mr. Vargas-Alcerreca. Neither of the two forms on which the jury recorded it’s guilty verdicts — attempted forcible rape and simple kidnapping — was signed by the foreman of the jury. La.C.Cr.P. art. 810 provides:
When a verdict has been agreed upon, the foreman shall write the verdict on the back of the list of responsive verdicts given to the jury and shall sign it. There .shall be no formal requirement as to the language of the verdict except that it shall clearly convey the intention of the jury.
The foreman of the jury shall deliver the verdict to the judge in open court.
The failure to sign the verdict form is error. See State v. Green, 2010-0791, p. 6 (La.App. 4 Cir. 9/28/11), 84 So.3d 573, 579, writ denied, 2011-2316 (La.S/9/12), 84 So.3d 551. Therefore, we must determine whether the error was harmless in this case. The three jury verdict forms in the record each have the charged offense, a numbered list of “possible verdicts”, a blank line for the verdict and one for the foreperson’s signature on the front, and a *578 handwritten notation on the back. As to the La. R.S. 14:42 charge, the front of the form lists nine possible verdicts with No. 4, “GUILTY OF ATTEMPTED FORCIBLE RAPE” circled, and “(29) 42.1” handwritten next to the circled verdict; on the back is the handwritten notation: “We the jury find the defendant guilty of attempted forcible rape.” As to the La. R.S. 14:44.1 charge, the front of the form lists five possible verdicts with l1sNo. 3, “GUILTY OF SIMPLE KIDNAPPING” circled, and “(27) 14:45” handwritten next to the circled verdict; the back contains the handwritten notation: “We the jury find the defendant guilty of simple kidnapping.”[6] Neither of these two forms contains the foreperson’s signature either on the front or back. The transcript of the trial proceedings states: “THE JURY PANEL RETURNED TO OPEN COURT AT APPROXIMATELY 10:30 p.m. WITH THE FOLLOWING VERDICTS: COUNT 1: GUILTY OF ATTEMPTED FORCIBLE RAPE; COUNT 2: GUILTY OF SIMPLE KIDNAPPING; AND COUNT 3: NOT GUILTY. NO POLL OF THE JURY WAS TAKEN.”
In State v. Green, supra, this court found harmless error where the foreperson had failed to sign the jury verdict forms for either of two defendants. In that case, the verdict forms to both defendants simply read: “Guilty.” The respective verdict forms each listed seven unnumbered responsive verdicts, with “Guilty” being the first, followed by five other verdicts of guilty of lesser offenses, and then by “Not Guilty”. We stated that the placement on the forms of “Guilty” as the first responsive verdict in both lists clearly signified that “Guilty” meant guilty of the offense charged, which in that case was armed robbery. In light of the fact that the evidence supported the verdicts, this court found that the verdict forms were not ambiguous but clearly conveyed the jury’s intent. Id.
Similarly, we find the failure of the foreperson to sign the verdict forms to be harmless error in the case before us. More so than the singular word “Guilty” in \K,Green, the notations written on the back of each form in this case unquestionably convey the jury’s intent.

ASSIGNMENTS OF ERROR

Mr. Vargas-AIcerreca raises six assignments of error, namely:
1. The trial court abused its discretion in allowing evidence of prior sexually assaultive behavior to be introduced when defendant was denied reasonable notice of that prior behavior and therefore was denied reasonable time to investigate that behavior.
2. The verdict of guilty of attempted forcible rape is contrary to the law and evidence.
3. The verdict of guilty of simple kidnapping is contrary to the law and evidence.
4. The trial court erred in denying defendant the right to exercise back-strikes during voir dire.
5. The sentences are overly harsh, factually unjustified, and unconstitutionally excessive.
6. The trial court erred in denying defendant’s motion for new trial.
We address each assignment in turn.
1. Evidence of Prior Sexually Assaul-tive Behavior
Mr. Vargas-AIcerreca argues that the trial court erred by allowing evidence *579 of his prior sexually assaultive behavior pursuant to La. C.E. art. 412.2,[7] despite 117knowing that he had been denied reasonable notice of that prior behavior and a reasonable time in which to investigate.
The record shows that on August 25, 2011, the State filed a notice to offer evidence of similar crimes, wrongs, or acts involving sexually assaultive behavior pursuant to La. C.E. art. 412.2. At a September 14, 2011 pretrial conference, the trial court overruled a defense objection to the State’s introduction of evidence of other sexually assaultive crimes, wrongs, or acts, but granted Mr. Vargas-Alcerreca’s motion for a continuance of the then-scheduled trial date of September 19, 2011. This court denied the State’s writ application seeking relief from the granting of the continuance. However, the Louisiana Supreme Court granted writs and reversed, finding that the trial court had abused its discretion by granting the continuance. State v. Vargas-Alcerreca, 2011-2003 (La.9/15/11), 69 So.3d 1132.
On appeal, Mr. Vargas-Alcerreca argues that after the Louisiana Supreme Court reversed the granting of the continuance, the trial court should have barred the introduction of the La. C.E. art. 412.2 evidence in the interest of justice. He argues that Federal Rule of Evidence 413, the federal counterpart to La. C.E. art. 412.2(B), is applicable and warrants relief. We disagree. However, we note that, whereas La. C.E. art. 412.2 simply requires that the State shall, “upon request of the accused, provide reasonable notice in advance of trial” of the evidence, Federal Rule 413 requires that the prosecutor disclose evidence of a prior sexual assault “at least 15 days before trial or at a later time that the court allows for good cause.” The record in this case reflects that the State filed its notice of its intent on August 25, 2011, which was longer than the fifteen days required by F.R.E. art. 413. 11sTherefore, Federal Rule 413, even if applicable, would not support the defendant’s argument.
Mr. Vargas-Alcerreca has failed to establish that the State’s notice, given almost one month before trial, was not reasonable. The Louisiana Supreme Court’s ruling was clearly based upon a finding that the introduction of the evidence was not improper due to late disclosure. Mr. Vargas-Al-cerreca essentially seeks to relitigate this issue, which we decline to do.
We therefore find no merit to this assignment of error.
2. Insufficient Evidence for Attempted Forcible Rape
Mr. Vargas-Alcerreca argues that the verdict of attempted forcible rape is contrary to the law and the evidence. The State contends that the defendant is precluded from raising this issue on appeal because he failed to raise it as a ground *580 for his motion for a new trial as required by La.C.Cr.P. art. 851(1). However, it is obvious from his argument that Mr. Vargas-Alcerreca questions the sufficiency of the evidence as to his- conviction for attempted forcible rape, which may be properly addressed on appeal.
This court set forth the applicable standard of review for sufficiency of the evidence in State v. Huckabay, 2000-1082 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the Mr. Vargas-Aleerreea guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be |19impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a Mr. Vargas-Alcerreca guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
Id., p. 32, 809 So.2d at 1111 (quoting State v. Ragas, 98-0011, pp. 13-14 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, 106-107 (quoting State v. Egana, 97-0318, pp. 5-6 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 227-28)).
Rape is defined by La. R.S. 14:41, in pertinent part, as “the act of vaginal sexual intercourse with a male or female person committed without the person’s lawful consent; emission is not necessary, and sexual penetration, however slight, is sufficient to complete the crime.”
Forcible rape is defined by La. R.S. 14:42.1, in pertinent part, as a “rape committed when the ... vaginal intercourse is deemed to be without the lawful consent of the victim ... because the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.”
La. R.S. 14:27, relative to attempted crimes, states, in pertinent part:
A. Any person who, having a specific intent to commit a crime, does or *581 omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall|2nbe immaterial whether, under the circumstances, he would have actually accomplished his purpose.
It is not disputed that M.V., M.A. and Mr. Vargas-Alcerreca partied and drank together at three bars on the night in question. Both women said they were not attracted to Mr. Vargas-Alcerreca romantically or sexually. The testimony of both women is essentially the same as to what occurred at the bars. M.V. testified that she did not consent to sex with Mr. Vargas-Alcerreca. The testimony of Eric Gordon, who saw Mr. Vargas-Alcerreca on top of M.V. repeatedly hitting her, corroborates M.V.’s testimony that the sex was not consensual. M.V.’s testimony that Mr. Vargas-Alcerreca hit her with his fists while raping her is consistent with her behavior and her appearance after the attack, as noted by Mr. Gordon, EMT Lori Flick and nurse Winoka Banks. Moreover, Mr. Vargas-Alcerreca indicated in a phone call from jail that he punched M.V. and broke her nose, but did not believe he would be convicted of rape because there was no penetration. This evidence clearly supports the conviction of attempted forcible rape.
Viewing the above evidence and all the other record evidence in a light most favorable to the prosecution, any rational trier of fact could have found all the elements of attempted forcible rape present beyond a reasonable doubt.[8] There is no merit to this assignment of error.
3. Insufficiency of Evidence of Simple Kidnapping
Mr. Vargas-Alcerreca again argues, as with regard to his conviction of attempted forcible rape, that the guilty verdict of simple kidnapping was contrary Li to the law and evidence. Like the previous assignment, we consider this argument as being directed to the sufficiency of the evidence, thus negating the State’s contention that the Mr. Vargas-Alcerreca failed to preserve this issue for review by failing to include it in his motion for new trial.
Mr. Vargas-Alcerreca correctly notes that the Louisiana Code of Criminal Procedure does not provide a set of statutory responsive verdicts to the charge of second degree kidnapping. See La. C.Cr.P. art. 814. However, La.C.Cr.P. art. 815 states that in all eases for which it does not specifically provide responsive verdicts, the responsive verdicts are: guilty, guilty of a lesser and included grade of the offense charged, and not guilty. “[A] lesser offense is included in the charge of a greater offense (and therefore responsive) if all of the elements of the lesser crime are included in the definition of the greater offense.” State v. Turnbull, 377 So.2d 72, 76 (La.1979).
La. R.S. 14:44.1 defines second degree kidnapping, in pertinent part, as “[t]he forcible seizing and carrying of any person from one place to another” or “[t]he enticing or persuading of any person to go from one place to another,” both wherein the victim is also “[pjhysieally injured or sexually abused.”
*582 La. R.S. 14:45 defines simple kidnapping, in pertinent part, as “[t]he intentional and forcible seizing and carrying of any person from one place to another without his consent.”
Mr. Vargas-Alcerreca refers to simple kidnapping as a non-responsive verdict. However, because all the elements of the crime of simple kidnapping are included in the definition of second degree kidnapping, simple kidnapping is a | ¡^responsive verdict to second degree kidnapping. See State v. Porter, 93-1106, pp. 3-4 (La.7/5/94), 639 So.2d 1137, 1140.
Mr. Vargas-Alcerreca’s primary argument is that the State failed to prove the elements of simple kidnapping because there was no evidence that Mr. Vargas-Alcerreca forcibly seized and carried the victim from one place to another without her consent. We disagree.
M.V. testified that she followed Mr. Vargas-Alcerreca because he said he was taking her to find her friend, until the point at which she began to feel she was in danger and started running the other way. She testified that Mr. Vargas-Alcerreca ran after her and caught up with her. She then found herself on the ground with Mr. Vargas-Alcerreca on top of her punching her in the face. Eric Gordon testified that he saw a woman, later identified as M.V., run out from behind a building calling for help, but then observed a male grab her and pull her back behind the building. He testified that as he approached the intersection where the building was, he could not see either the woman or her assailant, and he did not know how far down the street they were—in other words, he did not know how far of a distance the assailant had “carried” the victim. Under the simple kidnapping statute, “the distance traversed is immaterial.” State v. Bertrand, 247 La. 232, 170 So.2d 386, 388 (1964).
Any rational trier of fact, viewing all the evidence in a light most favorable to the prosecution, could have found that Mr. Vargas-Alcerreca forcibly seized and carried the victim a distance, however short, and thus have found all the essential elements of the offense of simple kidnapping present beyond a reasonable doubt. There is no merit to this assignment of error.
| ¡¾4. Right to Backstrike Jurors
Mr. Vargas-Alcerreca argues that the trial court erred in denying Mr. Vargas-Alcerreca the right to backstrike a juror.
Mr. Vargas-Alcerreca correctly states that backstrikes of prospective jurors during voir dire are expressly provided for by law. See La.C.Cr.P. art. 799.1.[9] At the first challenge conference during voir dire, prior to any challenges by either side, the trial judge informed counsel that “I don’t do back-strikes, given the fact that these are the simultaneous objections.” However, the record reflects that defense counsel did not object to this statement in any way, at any time, and further that defense counsel never attempted to backstrike any prospective juror. La.C.Cr.P. art. 841(A) *583 states, in pertinent part, “An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.”
In his appellate brief Mr. Vargas-Al-cerreca cites one member of the jury that convicted him, a Ms. Thornton, “who would have certainly been considered for back-striking.” He further asserts that during the trial Ms. Thornton became angry with his defense counsel with such intensity that counsel moved several times that she be removed from the jury, which requests were denied by the court. The record reflects that defense counsel complained that Ms. Thornton was speaking with the juror next to her during the testimony of the first witness. Defense 1 ^counsel moved for a mistrial, arguing that Ms. Thornton might have been discussing the facts of the case and that at the very least had disturbed other jurors. The trial court denied that motion, as well as defense counsel’s alternative request to have Ms. Thornton removed.
However, none of this after-the-fact conduct is relevant to the issue of whether Mr. Vargas-Alcerreca was denied his legal right to backstrike Ms. Thornton prior to the jury being sworn. The defendant’s failure to contemporaneously raise the issue and to identify the particular juror he wished to backstrike at the relevant time precludes consideration of this issue on appeal. See State v. Hailey, 2002-1738, pp. 8-9 (La.App. 4 Cir. 9/17/03), 863 So.2d 564, 569. There is no merit to this assignment of error.
5. Excessive Sentences
Mr. Vargas-Alcerreca argues that both of his sentences are constitutionally excessive, an objection defense counsel made at the sentencing hearing.
La. Const, art. I, § 20 explicitly prohibits excessive sentences. Although a sentence is within the statutory limits, the sentence may still violate a defendant’s constitutional right against excessive punishment. State v. Every, 2009-0721, p. 7 (La.App. 4 Cir. 3/24/10), 35 So.3d 410, 417 (quoting State v. Smith, 2001-2574, p. 7 (La.1/14/03), 839 So.2d 1, 4). “However, the penalties provided by the legislature reflect the degree to which the criminal conduct is an affront to society.” State v. Cassimere, 2009-1075, p. 5 (La.App. 4 Cir. 3/17/10), 34 So.3d 954, 958. “A sentence is unconstitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime.” State v. Ambeau, 2008-1191, p. 9 (La.App. 4 Cir. 2/11/09), 6 So.3d 215, 221. “A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice.” State v. Galindo, 2006-1090, pp. 15-16 (La.App. 4 Cir. 10/3/07), 968 So.2d 1102, 1113.
In reviewing a claim that a sentence is excessive, an appellate court generally must determine whether the trial judge has adequately complied with statutory guidelines in La.C.Cr.P. art. 894.1 and whether the sentence is warranted under the facts established by the record. State v. Wiltz, 2008-1441, p. 10 (La.App. 4 Cir. 12/16/09), 28 So.3d 554, 561 (quoting State v. Batiste, 2006-0875 (La.App. 4 Cir. 12/20/06), 947 So.2d 810). If adequate compliance with La.C.Cr.P. art. 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of the case, keeping in mind that maximum sentences should be reserved for the most egregious offenders. State v. Bell, 2009-0588, p. 4 (La.App. 4 Cir. 10/14/09), 23 So.3d 981, 984.
*584 However, even where there has not been full compliance with La. C.Cr.P. art. 894.1, resentencing is unnecessary where the record shows an adequate factual basis for the sentence imposed. See La.C.Cr.P. art. 881.4(D)(noting that the appellate court “shall not set aside a sentence for exces-siveness if the record supports the sentence imposed.”); State v. Stukes, 2008-1217, p. 25 (La.App. 4 Cir. 9/9/09), 19 So.3d 1233, 1250, citing State v. Major, 96-1214, p. 10 (La.App. 4 Cir. 3/4/98), 708 So.2d 813, 819.
Mr. Vargas-Alcerreca was sentenced to seventeen years at hard labor on his conviction for attempted forcible rape, which is three years less than the maximum twenty-year term of imprisonment for that crime. See La. R.S. 14:27(D)(3) and |2(iR.S. 14:42.1. Mr. Vargas-Alcerreca was also sentenced to five years at hard labor on his conviction for simple kidnapping, the maximum sentence for that offense. He was twenty-seven years old at the time of sentencing.
In sentencing Mr. Vargas-Alcerreca, the trial court stated that it had read numerous letters from some of the defendant’s relatives and friends and had considered victim-impact letters from M.V. and her family. The court also noted that the sentences imposed were based on the evidence it had heard throughout trial.
Mr. Vargas-Alcerreca argues that the jury rejected nine more severe verdicts in judging his conduct. However, we find that the evidence supports the sentences imposed. The evidence establishes that Mr. Vargas-Alcerreca lured a nineteen-year-old woman, a visitor to the City of New Orleans from France, to a deserted area by falsely promising to take her to her friend. When she sensed danger and tried to escape, he chased her, grabbed her, got her on the ground, and then climbed on top of her and repeatedly hit her with his fists while trying to rape her. He fled the scene only when a good Samaritan showed up.
M.V. testified at trial that in addition to her physical injuries, she had suffered a loss of self-confidence and had gone through a period of depression. She testified that after the attack, she purchased some mace, and that she is still scared every time she is alone on the street. The State additionally presented M.B., who testified that Mr. Vargas-Alcerreca had similarly assaulted her in Buras, Louisiana, about nineteen months prior to his assault of M.V. In view of this evidence, we conclude that the sentence of seventeen years for attempted forcible rape is not excessive.
|27As for the maximum five-year sentence imposed on Mr. Vargas-Alcerreca for simple kidnapping, we note that the evidence clearly would support a conviction of the greater charged offense of second degree kidnapping, which would have carried a sentence of imprisonment at hard labor for five to forty years. Therefore, the record supports the sentence for the defendant’s conviction of simple kidnapping. Considering also that the five-year sentence for simple kidnapping is to be served concurrently with Mr. Vargas-Al-cerreca’s seventeen-year sentence, we do not find the five-year sentence to be excessive.
Considering the totality of the facts and circumstances, we do not find that Mr. Vargas-Alcerreca’s sentences make no measurable contribution to acceptable goals of punishment, are nothing more than the purposeless imposition of pain and suffering, or are grossly out of proportion to the severity of the crimes. When the crimes and punishment are considered in light of the harm done to society, these sentences do not shock the conscience.
*585 There is no merit to this assignment of error.
6. Denial of Motion for New Trial
In his last assignment of error, Mr. Vargas-Alcerreca argues that the trial court erred in denying his motion for a new trial. La.C.Cr. P. art. 851 provides, in pertinent part:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
(1) The verdict is contrary to the law and the evidence;
(2) The court’s ruling on a written motion, or an objection made during the proceedings, shows prejudicial error;
128 ⅛ *
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
La.C.Cr.P. art. 852 provides that a motion for new trial “shall be in writing, shall state the grounds upon which it is based, and shall be tried contradictorily....”
A trial court assessing the legal merits of a motion for new trial is given considerable latitude in evaluating the reliability of the evidence and its impact on the verdict. State v. Brooks, 98-0693, p. 12 (La.App. 4 Cir. 7/21/99), 758 So.2d 814, 820. A trial court has much discretion in ruling on a motion for new trial. State v. Cureaux, 98-0097, p. 4 (La.App. 4 Cir. 5/26/99), 736 So.2d 318, 321. Review of the trial court’s ruling is limited to determining whether the trial court abused its discretion. State v. Labran, 97-2614, p. 6 (La.App. 4 Cir. 5/26/99), 737 So.2d 903, 907.
In this assignment of error, Mr. Vargas-Alcerreca asserts that the two guilty verdicts were contrary to the law and evidence; that the trial court erred in denying his motion for a recess so that his defense expert could arrive from Baton Rouge; and that the trial court erred in admitting the evidence concerning the alleged prior sexual assault.
As we have previously noted, Mr. Vargas-Alcerreca did not raise the ground that either verdict was contrary to the law and evidence in his motion for new trial. Therefore, we decline to consider that argument.

Trial court’s commenting on the evidence

Mr. Vargas-Alcerreca first argues that the trial court improperly commented on the evidence by informing the jury that a recess was being called to await the arrival of a defense witness, which caused a negative reaction by one juror to the 129delay. However, the ground asserted by Mr. Vargas-Alcerreca in his motion for new trial was that the trial court had erred by denying his motion to recess the trial until his expert witness was available to testify. In fact, as the record reflects, the trial court granted Mr. Vargas-Aleerreca’s motion to recess the trial, and then defense counsel changed his mind and withdrew the request for a recess.
Initially, defense counsel requested a recess so that his expert — who had testified in a trial in Baton Rouge, Louisiana— could travel to New Orleans. Defense counsel represented that only a thirty-minute recess would be needed. The trial court informed the jury:
Ladies and gentlemen, the Defense is asking for a recess. There is a witness in route, and I’ve decided to give him *586 that brief recess. Now, the problem is that we’re going to be running up on our lunch. So we’re going to take an early lunch break. I’m going to allow him an opportunity to see if this witness can be here. Once lunch is over, if the witness is not, we will proceed without them [sic].
After the jury had left the courtroom, defense counsel noted that “at least” one of the jurors seemed frustrated with the delay. Defense counsel then objected to the trial court’s having informed the jury that it was the defense counsel who had requested the recess, and informed the trial judge that, considering that circumstance, the defense was choosing to go forward with trial. The trial court then brought the jury back in before they began their lunch break and informed the jurors that so as not to delay the trial, the defense had chosen not to wait for the expert witness.
Because Mr. Vargas-Alcerreca failed to raise the trial court’s allegedly having “commented on the evidence” in violation of La. C. Cr. P. art. 772 as a ground for his motion for new trial, he cannot raise this issue on appeal as a reason why the trial court erred by denying his motion for new trial.
| xnAdmission of evidence of alleged prior sexual assault
Mr. Vargas-Alcerreca argues that the trial court erred by denying his motion for new trial because the court erroneously admitted evidence of the unadjudicated 2009 sexual assault of M.B. in Plaquemines Parish. Mr. Vargas-Alcerreca raised some, but not all, aspects of this issue as grounds in his motion for new trial.
First, Mr. Vargas-Alcerreca argues that trial court erred by failing to balance the probative value of the evidence of the 2009 sexual assault against its prejudicial effect. However, a trial court’s ruling admitting/permitting the introduction of evidence carries with it an implicit conclusion that the trial court found that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, as per La. C.E. art. 403. See State v. Magee, 2011-0574, p. 49, n. 37 (La.9/28/12), 103 So.3d 285, 320, n. 37. La. C.E. art. 412.2(A) expressly states that the evidence that may be admissible under the statute is “subject to the balancing test provided in Article 403.”
In addition to arguing that the trial court’s failed to perform the balancing function, Mr. Vargas-Alcerreca also argues that the trial court erred in its conclusion. “A trial court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect.” State v. White, 2009-0025, p. 9 (La.App. 4 Cir. 9/16/09), 22 So.3d 197, 204. We cannot say that the trial court’s conclusion in this case that the probative value of the evidence of the 2009 unadjudicated sexual assault outweighed its prejudicial effect constituted an abuse of its discretion. Even if we |aiwere to find error, the overwhelming evidence of the defendant’s guilt would render the error harmless.
Mr. Vargas-Alcerreca also argues the article 412.2 evidence was improperly admitted due to the late disclosure (on the morning of trial) of M.B.’s prior criminal record and of the Plaquemines Parish police report of the incident testified to by M.B. However, Mr. Vargas-Alcerreca did not assert any ground in his motion for new trial relating to the criminal record of M.B. not having been given to him until the morning of trial. He also did not complain in his motion for new trial as to the timing of the State’s turning over of the Plaquemines Parish police report; he *587 complained only that certain statements of M.B. and her roommate, allegedly contained in the report, were never turned over to him. Because Mr. Vargas-Al-cerreca did not raise these issues as grounds for his motion for new trial, we decline to consider them on appeal in determining whether the trial court abused its discretion by denying that motion.
Because we conclude that the trial court’s denial of the defendant’s motion for new trial was not an abuse of discretion, we reject this assignment of error.
CONCLUSION
For the reasons stated, Mr. Vargas-Alcerreca’s convictions and sentences are affirmed.
AFFIRMED.

. State v. Vargas-Alcerreca, unpub., 2011-1279 (La.App. 4 Cir. 9/15/11), writ granted, 2011-2003 (La.9/15/11), 69 So.3d 1132.

. State v. Vargas-Alcerreca, unpub., 2011-1320 (La.App. 4 Cir. 9/20/11), writ denied, 2011-2037 (La.9/20/11), 70 So.3d 799.

.The victim and certain witnesses are referred to by their initials to protect their privacy.

. As shown in the photographs introduced into evidence, the "sticker pod” referred to appears to be a small, prickly burr, which might be found on the ground as having fallen from a tree, and which would have a tendency to adhere to clothing.

. Yolanda Haynes, a 911 operator, identified the 911 incident recall and audio CD of an aggravated rape call that came in at 4:20 a.m. relative to the intersection of Decatur and *577 Mandeville Streets. She confirmed that a party named Eric Gordon had made the 911 call and had said he was present with the victim. Mr. Gordon had also reported that the male suspect had left the scene, heading away from the river.

. The third verdict form, reflecting that the defendant was found not guilty of attempted second degree robbery, is not relevant to this patent error because that form contains the foreperson’s signature.

. La. C.E. art. 412.2 states:
A.When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused’s commission of another crime, wrong, or act involving sexually as-saultive behavior or acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.
B. In a case in which the state intends to offer evidence under the provisions of this Article, the prosecution shall, upon request of the accused, provide reasonable notice in advance of trial of the nature of any such evidence it intends to introduce at trial for such purposes.
C. This Article shall not be construed to limit the admission or consideration of evidence under any other rule.

. At the end of this assignment of error Mr. Vargas-Alcerreca notes that the verdict sheet as to the forcible rape count was not signed by the foreman of the jury, an issue previously addressed as an error patent. Mr. Vargas-Alcerreca also complains that the jury was not polled. However, the jury is required to be polled only “if requested by the state or the Mr. Vargas-Alcerreca.” La. C.Cr.P. art. 812.

. La.C.Cr.P. art. 799.1 states:
Notwithstanding any other provision of law to the contrary, and specifically notwithstanding the provisions of Article 788, in the jury selection process, the state and the defendant may exercise all peremptory challenges available to each side, respectively, prior to the full complement of jurors being seated and before being sworn in by the court, and the state or the defendant may exercise any remaining peremptory challenge to one or more of the jurors previously accepted. No juror shall be sworn in until both parties agree on the jury composition or have exercised all challenges available to them, unless otherwise agreed to by the parties.