583 So.2d 593 (1991)
STATE of Louisiana
v.
Bernell CROCKETT, Sr.
No. 89-KA-1999.
Court of Appeal of Louisiana, Fourth Circuit.
June 27, 1991.
*594 Harry F. Connick, Dist. Atty., Val M. Solino, Asst. Dist. Atty., New Orleans, for plaintiff/appellee.
Dwight Doskey, Orleans Indigent Defender Program, New Orleans, for defendant/appellant.
Before ARMSTRONG, PLOTKIN and BECKER, JJ.
BECKER, Judge.
Defendant, Bernell Crockett, Sr., was initially charged, tried and convicted of the forcible rape of Janice Chandler, a violation of La.R.S. 14:42.1, in August 1984. His conviction was reversed by this court and remanded for a new trial after we found that defendant's original counsel failed to discover and present certain medical evidence, denying him a fair trial. State v. Crockett, 537 So.2d 242 (La.App. 4th Cir. 1988). In August 1989, following a retrial, a twelve member jury found defendant guilty as charged of forcible rape. After waiving legal delays, defendant was sentenced to serve thirty years at hard labor, the first two years without benefit of probation, parole or suspension of sentence. Defendant now appeals.

FACTS
On June 16, 1984, the victim, Janice Chandler, and her husband at the time, Kermit Chandler, spent the evening drinking in a lounge located near their Lafitte Housing Project apartment. Sometime after midnight, they went to a nearby restaurant but found they did not have enough money to purchase two sandwiches. They returned to their apartment; Kermit went upstairs to obtain some money, while Janice waited on the front porch. After waiting several minutes, she walked away from the porch to see if the restaurant lights were still on.
At the corner of Galvez Street and Orleans Avenue, a man, later identified as defendant, accosted her, ordering her to stop and pressing a gun to her head. The assailant pushed her about two-and-a-half blocks to a rear hallway in a project apartment unit. Defendant kissed her, then ordered her to remove her blouse. Defendant forced the victim to take his penis in her mouth, and became disgusted when he could not achieve an erection. Defendant then attempted to rape the victim vaginally and anally, but was unable to achieve an erection or penetrate her vaginally or anally. When a car pulled up in a nearby driveway, the victim told defendant it was her aunt and he fled. The victim obtained clothing from the couple in the car and subsequently contacted her sister who called police.
The victim was taken to Charity Hospital where Dr. Terry Noah performed an initial examination. Dr. Noah testified that the victim informed him that she drank eight beers on the evening of the rape, and that her last prior intercourse had been on June 15th, between five and twenty-four hours before the examination. Dr. Noah found a tear in the victim's anal area, approximately one-half centimeter long, which, he testified, could have been caused by either a finger or a penis. Dr. Noah took oral, vaginal and rectal swabs from the victim.
Ms. Patricia Daniels, a medical technician with the Orleans Parish Coroner's Office, testified that the vaginal swab tested positive for seminal fluid and spermatazoa. The oral and rectal swabs tested negative. Ms. Daniels stated that spermatazoa could live in the vaginal tract twenty-four to forty-eight hours after intercourse. The victim was found to be a blood type B secretor, whereas the defendant was a non-secretor. No blood groups were found in the vaginal swab taken from the victim.
While at Charity Hospital the victim spoke with Detective Rod Bailey. She described her assailant as slightly larger than she was (she was nearly 5'2" tall) with protruding front teeth, and teeth missing from the upper right portion of his mouth.
*595 Later the same day as the attack, June 16th, the victim and her husband retraced the route taken by the victim and her assailant to the site of the attempted rape. The victim saw the defendant, and, although the defendant knew the victim was following him, he walked to his apartment. The victim contacted police, and later that evening she accompanied two officers to the apartment into which she had seen defendant enter. It turned out to be the apartment of defendant and his mother. The victim identified defendant after his mother summoned him to the door. Defendant was arrested, and at a subsequent photo identification conducted by police some six weeks after his arrest, defendant was again identified by the victim as her attacker.
Dr. Daniel Rush, a specialist in vascular surgery, testified on behalf of defendant. Dr. Rush stated that defendant first came to him in January 1983, complaining of pain in his legs when playing basketball. Tests revealed that defendant was suffering from an intense inflammation of the aorta which actually caused deterioration of the aortic wall, which in turn produced a blood clot resulting in a complete blockage of the main blood vessel to defendant's right leg. Dr. Rush stated that he knew of only one other case in the United States involving this type of inflammatory condition. At that time defendant reported having sexual relations about once a week; tests showed a minimal reduction of blood pressure in defendant's penis which was still considered in the normal range.
Defendant underwent surgery in January 1983, during which a plastic tube was inserted to circumvent the blocked blood vessels. Three months later, in March 1983, defendant indicated that his sexual functioning was somewhat improved. The percentage of blood flow to his right leg had improved from 40-50% of normal to 100%. However, one month later defendant complained of pain in his left leg, formerly the "good leg." Tests revealed that there was only a 40% blood flow to defendant's left leg.
Tests further showed that defendant's right penile artery pressure was 0% of normal, the left 75%a seriously decreased pelvic blood flow. Dr. Rush testified that most males with defendant's level of blood flow at that time would be impotent and that the defendant could not have committed a rape. Dr. Rush did not treat the defendant after May 1983, but testified that it was very unlikely that the defendant's condition could improve. Dr. Rush testified he did not discuss in great detail the defendant's sexual functioning (or lack of functioning) and did not know if the defendant was able to ejaculate.
Defendant testified that he has been unable to achieve or maintain an erection since January 1983. He denied committing the alleged attack and stated that he was at home with his girlfriend on the evening of the alleged rape. Defendant's mother, Ms. Lavinia Crockett, testified that defendant and his girlfriend lived in her Lafitte Project apartment and were in the apartment the night of the crime as claimed by defendant. Mrs. Crockett said she was a very light sleeper and would have heard defendant leave the apartment via the only door used by them, the rear one, which had to be slammed shut to lock. Ms. Crockett also testified that when she arose Saturday morning at 6:30 a.m. her son was asleep in his bed.
Defendant raises two assignments of error on appeal. We have reviewed the record for errors patent and find none.

ASSIGNMENT OF ERROR NO. ONE
By this assignment of error defendant claims that the trial court erred in denying his motion for a mistrial, despite the prosecutor's repeated references to the defendant's first trial.
There are numerous references to a prior hearing and prior testimony throughout the trial in the instant case, both by the prosecutor and defense counsel. There were also references to defendant's first trial by the prosecutor. The first was when the prosecutor attempted to impeach defendant's mother by suggesting that she had the benefit of reading the transcript of the *596 "last trial." No objection was made at this time by defense counsel. Later, during his cross-examination of defendant the prosecutor stated, "you looked at the whole trial transcript." After an objection by defense counsel, the court instructed the prosecutor to omit the word "trial." Also, during the cross-examination of defendant the prosecutor confusingly stated, "you have to [sic] privy to the last jury...." Defense counsel objected and the trial judge ordered him to make clear what he was talking about. However, defense counsel also referred directly to the previous trial. The prosecutor was questioning defendant about his girlfriend's testimony given at the first trial without mentioning the word trialwhen defense counsel stated:
"Your Honor, if we're going to ask about hearsay, I'd be willing to introduce [the girlfriend's] testimony from the last trial."
The prosecutor then asked defendant, "Did [your girlfriend] ever mention anything at allyou were on trial for rape." There was no objection from defense counsel.
La.C.Cr.P. art. 857 provides:
"The effect of granting a new trial is to set aside the verdict of judgment and to permit retrial of the case with as little prejudice to either party as if it had never been tried."
The Louisiana Supreme Court interpreted this article in State v. Reed, 324 So.2d 373 (La.1975). The court stated:
"As a minimum, it would seem that the article was intended to mask from the jury members the fact that a defendant before them had previously been convicted."
In State v. Lee, 346 So.2d 682 (La.1977), cited by defendant, the prosecutor, during rebuttal argument, made several references to defendant's first trial, and "two very specific references" to the fact that on that first trial the defendant had been convicted of murder. The Louisiana Supreme Court again reversed defendant's conviction, stating:
"There is no doubt but that the district attorney in rebuttal argument referred directly to defendant's earlier conviction for this offense. We believe that it was substantial prejudicial conduct and that such made it impossible for defendant to obtain a fair trial." (Emphasis added.)
The court further stated:
"It is a jury's duty to determine a criminal defendant's guilt or innocence on the strength of the evidence presented to it, uninfluenced by the fact that on an earlier occasion (and under circumstances so defective as to invalidate the conviction), he had been found guilty of the offense by a different jury. When a jury is informed by the state that the accused was convicted of the crime on a previous occasion, the defendant's right to a fair trial, protected by the federal and state constitution, has been violated." (Emphasis added.)
In State v. Albert, 381 So.2d 424 (La. 1980), a prosecutor referred to other trials "involving" the victim, for whose murder defendant was being tried. The court distinguished State v. Lee, supra, on two grounds, one, that the remark by the prosecutor in Albert did not pin-point the defendant as being involved in the previous trials, and two, there was no reference to a conviction. In State v. Lindsey, 543 So.2d 886 (La.1989), the Supreme Court again cited the absence of a reference to a prior conviction as a factor in determining that a trial court did not err in refusing to grant a mistrial after the prosecutor questioned a witness about his having seen the defendant "in this [courthouse]" on a prior occasion.
In the instant case the prosecutor made no references to defendant's having been previously convicted, only that there was a prior trial. We note that defense counsel himself made a direct comment about the previous trial when he offered to introduce the testimony of defendant's girlfriend from the "last trial."
Under these circumstances we cannot say that the trial court erred when it denied defendant's motion for a mistrial based upon the prosecutor's references to the first trial. This assignment of error is without merit.

*597 ASSIGNMENT OF ERROR NO. TWO
By his second assignment of error, defendant contends that the evidence presented at trial is insufficient to support his conviction of forcible rape. Our review of this assignment is limited to determining whether, viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that each element of the crime was proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Mussall, 523 So.2d 1305 (La.1988).
The elements of the offense of forcible rape at the time of defendant's arrest and trial were: (1) the act of anal or vaginal sexual intercourse; (2) with a person not the spouse of the offender; (3) without lawful consent of the victim; (4) when the victim is prevented from resisting the act by force or threats of physical violence, under circumstances where the victim reasonably believes such resistance would not prevent the rape; and (5) where the offender makes the slightest anal or vaginal sexual penetration. La.R.S. 14:41; 14:42.1.[1]
The initial question raised by defendant is whether the victim's testimony is credible. This testimony is the only evidence linking this defendant to this crime. The victim testified much differently in the 1989 trial than at the 1984 trial. In 1984, she testified that her attacker had vaginal intercourse for two minutes. In the instant case the victim testified that defendant never entered either her vagina or anus and was unable to achieve or maintain an erection. There were also several minor inconsistencies between the victim's statements to Detective Bailey, the investigating officer, and her testimony at trial in 1984 and her 1989 trial testimony.
However, these contradictions and inconsistencies do not rise to a level of incredibility. Any rational trier of fact could have believed her testimony given at this trial.
Defendant next argues that even viewing all the evidence in the light most favorable to the prosecution, the State failed to prove that defendant committed a forcible rape. The defendant specifically argues that the victim testified that defendant was unable to achieve or maintain an erection, and therefore, penetration never occurred. This argument has merit.
The slightest penetration is sufficient to prove a rape. L.S.A.-R.S. 14:41(B). However, the victim in the present case testified, no less than seven times on direct examination and three times on cross-examination, that the defendant did not enter her either vaginally or anally. On pages 112 and 113 of the transcript she testified on direct examination as follows:
Let's try now. When he forced you to do this, Mrs. Chandler, I need to ask you a few questions about it. Was his penis hard?
A. No. it wasn't.
Q. Did it become hard as you did that?
A. No, sir.
Q. What did he make you do next?
A. Well, while it was in my mouth, it just stayed, just limp. It wasn't hard or anything. Then I was told to get on my back and I got on my back and he tried that way and he was very disgusted because he kept shoving and he just couldn't get hard and it just stayed limp, so he said, "oh, bitch, you ain't about nothing", so he turned me over on my face and tried to go in my rectum. He couldn't succeed then either.
Q. What happened then?
A. He just kept shoving and trying to shove, trying to shove it in but he couldn't get hard enough to go in, and I felt something sharp and it was like just cutting my rectum because I wasit was hurting.
Q. Did you know if he had anything in his hands?
A. He didn't have nothing in his hands, because he was holding the gun with one hand and he had his hand on my back like this (demonstrating), trying to go up against me.

*598 Q. Did the man who did this to you, did he ever get hard enough?
A. He did not get hard at all. He stayed limp. He just could not get hard for some reason or another.
Q. Did he enter?
A. He couldn't enter because he couldn't get hard enough. He stayed at the front part of my vagina as well as the front part of my rectum.
Q. Do you know if any part of his penis entered into your vagina?
A. No, it didn't enter. It was right here around the edge, almost like that (demonstrating).
Q. Did he ever get hard?
A. No, sir, he didn't get hard.
Although there was evidence that medical tests revealed the presence of seminal fluid and spermatazoa in the victim's vagina and a two centimeter tear in her rectum, there is also evidence that the victim had intercourse with her husband the morning before the attack and that the attacker had inserted his finger in the victim's rectum. Therefore, considering the victim's testimony on both direct and cross examination that there had been no penetration of her vagina or rectum by the attacker's penis, coupled by the expert testimony of Dr. Rush that the defendant was incapable of achieving an erection, we find that the State has failed to prove one of the elements of the crime of forcible rape, penetration, beyond a reasonable doubt.
However, there is sufficient evidence to prove that the defendant committed an attempted forcible rape.[2] The attempted forcible rape was committed without the lawful consent of the victim, because the victim was prevented from resisting the act by force and threats of physical violence, under circumstances where the victim reasonably believed that such resistance would not prevent the rape. L.S.A.-R.S. 14:27(42.1). The victim testified that the defendant had a gun pointed to her head and threatened her on repeated occasions. A reasonable inference is that she did not resist the defendant's actions more vigorously because she reasonably believed that such resistance would not prevent the rape. State v. Montana, 533 So.2d 983 (La.App. 4th Cir.1988).
Accordingly, the defendant's conviction and sentence for forcible rape are reversed and a judgment of guilty to the lessor included offense of attempted forcible rape is rendered. This matter is remanded to the trial court for resentencing in accordance with this opinion.
REVERSED, JUDGMENT RENDERED, REMANDED FOR RESENTENCE.
NOTES
[1] La.R.S. 14:41 was amended by Acts 1990, No. 722, Sec. 1 to delete as an element of the crime of rape, the requirement that the victim be a person not the spouse of the offender.
[2] L.S.A.-R.S. 14:27.

Attempt
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
B. Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.
C. An attempt is a separate but lesser grade of the intended crime; and any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was actually perpetrated by such person in pursuance of such attempt.