2016-0284 (La.App. 4 Cir. 12/14/16)

**STATE of Louisiana**

v.

**Daniel CASTRO**

**NO. 2016–KA–0284**

Court of Appeal of Louisiana, Fourth Circuit.

DECEMBER 14, 2016

Leon A. Cannizzaro, Jr., District Attorney, Donna Andrieu, Assistant District Attorney, Chief of Appeals, Mithun Kamath, Assistant District Attorney, PARISH OF ORLEANS, 619 South White Street, New Orleans, LA 70119, COUNSEL FOR APPELLEE/STATE OF LOUISIANA

Holli Herrle–Castillo, LOUISIANA APPELLATE PROJECT, P. O. Box 2333, Marrero, LA 70073, COUNSEL FOR DEFENDANT/APPELLANT

(Court composed of Judge Terri F. Love, Judge Paul A. Bonin, Judge Sandra Cabrina Jenkins)

PAUL A. BONIN, JUDGE

A jury found Daniel Castro guilty of the attempted aggravated rape of Angelica

Jones (a pseudonym by which we protect her privacy), the mentally-disabled adult daughter of his live-in girlfriend, Blanche Jones (also a pseudonym), with whom he resided in the same home. Mr. Castro was thereafter sentenced to a term of fifty years imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. He now appeals his conviction but not his sentence.

By his single assignment of error, Mr. Castro contends that the evidence was insufficient to support his conviction. Specifically, he argues, the prosecution did not prove beyond a reasonable doubt that penetration was attempted or achieved, and also failed to exclude a reasonable hypothesis of innocence. After examining all of the evidence under the well-known *Jackson v. Virginia*[1] standard, we conclude that the evidence in this case was sufficient to establish the essential elements of the offense for which Mr. Castro was convicted.

▮▮▮ |₂Accordingly, we affirm Mr. Castro's conviction.[2] We explain our decision in greater detail below.

# I

In this Part, we set forth the facts pertinent to our review of the sufficiency of evidence.

# A

Angelica, the victim, was twenty-five years old at the time of the offense. She is severely mentally disabled and under the full-time care of her mother, with whom she resides. Angelica requires assistance with virtually every daily activity, such as brushing her teeth, bathing herself, and using the bathroom. She is able to dress herself but requires assistance with fasteners, such as zippers, snaps, or buttons. Angelica also wears a diaper.

Blanche Jones met Mr. Castro while he was performing construction work at her home. They later became romantically involved and Mr. Castro moved into the home with Blanche and Angelica.

|₃On the morning of September 26, 2013, Ms. Jones left the house to go to the bank.[3] Both Angelica and Mr. Castro re-

---

1. 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

2. We have, as we always do, examined the record for errors patent and have detected one, but it does not require reversal. *See* La. C.Cr.P. art. 920(2). Under La. C.Cr.P. art. 873, sentence may not be imposed until at least twenty-four hours after the trial judge has denied a motion for new trial, unless "the defendant expressly waives [the] delay." In this case Mr. Castro was sentenced on the same date that his motion for new trial was denied. Despite the "expressly" language in the statute, a defendant may implicitly waive the twenty-four-hour delay. *See, e.g., State v. Pollard*, 14–0445, p. 21 (La.App. 4 Cir. 4/15/15), 165 So.3d 289, 304 (defendant may waive twenty-four-hour delay by announcing his readiness for sentencing) *State v. Santos–Castro*, 12–0568, p. 17 (La.App. 4 Cir. 7/31/13), 120 So.3d 933, 943–44 (same). Here, counsel for Mr. Castro, at the motion for new

trial hearing, stated that he intended to file a motion for appeal after sentencing. After the trial judge denied the motion for new trial, counsel informed the court that he would be calling witnesses for the sentencing determination. Thus, Mr. Castro implicitly waived the delay when he expressed his readiness to proceed with sentencing. Moreover, where a defendant does not challenge his sentence on appeal or raise the failure to observe the delay as an error, any error is harmless. *See State v. Foster*, 02–0910, p. 3 (La.App. 4 Cir. 12/11/02), 834 So.2d 1188, 1191.

3. There is some discrepancy with regard to whether Ms. Jones went to the bank or to work before returning home on the day of the incident. The 911 recording, Dr. Nena Mehta's report, and Detective Kurt Coulon's testimony indicate that Ms. Jones went to the bank. At trial, however, Ms. Jones stated she told the defendant she was going to work to

mained at home. But before she left the house, Ms. Jones locked Angelica inside of Angelica's bedroom because she suspected that Mr. Castro had previously engaged in inappropriate behavior with her daughter.[4] At the time Ms. Jones left, Mr. Castro was in the front living room of the shotgun house. [5] Ms. Jones stated that Mr. Castro had a key to the front door, but emphasized that he did not have a key to Angelica's bedroom door. Ms. Jones also testified that Angelica is able to walk but cannot open locked doors.

Ms. Jones returned home approximately thirty minutes to an hour later to find Angelica's bedroom door open. It appeared to Ms. Jones that the door had been pried open with a crowbar found near the bedroom entrance. She saw that Angelica was no longer in her bedroom. She then discovered her daughter and Mr. Castro in the back bedroom, the one which Ms. Jones shared with the defendant. Ms. Jones testified that Angelica would not have walked from her bedroom to Ms. Jones's bedroom in the back of the house on her own. Upon arriving at the back bedroom, Ms. Jones saw that both Angelica and Mr. Castro were naked and she observed him "cleaning" Angelica with the bed sheet. She stated that she wiped [4]the side of Angelica's vagina with her hand and felt what she believed to be semen. Ms. Jones called the police, who arrested Mr. Castro.

When Detective Kurt Coulon arrived at the residence, he took a statement from Ms. Jones through an interpreter. She told him that she observed Mr. Castro in bed with her daughter and that Angelica's vagina "smelled like sex." Although Det. Coulon did not observe any visible damage to the door and did not see or seize a crowbar at the scene, he recalled at trial that Ms. Jones mentioned a crowbar to him. Det. Coulon could not interview Angelica because she was unable to verbally communicate. He subsequently obtained two swabs from Mr. Castro, penile and oral, and submitted them to the Louisiana State Police for testing.

On the same day, Angelica was taken to the Children's Advocacy Center for an examination by Dr. Nena Mehta. She performed a rape kit but had difficulty swabbing Angelica and conducting portions of the test because Angelica could not understand or comply with requests. Dr. Mehta was able to swab Angelica's breasts; a "hickey" mark she observed on Angelica's right shoulder; the external part of her vagina between the labia majora and labia minora; her inguinal fold, "the fold of skin between the leg and the lips of the vagina;" and outside her anus. Dr. Mehta stated that she had observed menstrual blood from the external swab of Angelica's vagina and in her diaper. She was unable to swab Angelica's mouth [6] or the interior of Angelica's vagina or anus due to Angelica's disability. The swabs were turned over to law enforcement.

[5]Dr. Raphael Salcedo, an expert in forensic psychology, testified that he frequently works with developmentally disabled individuals to evaluate their level of disability and adaptive functioning. Dr. Salcedo stated that Angelica was initially

---

"test" him, but that she actually went to the bank.

**4.** Ms. Jones testified that about a month prior to the incident, she observed and felt something "slimy" that she believed to be semen on the side of Angelica's vagina. When she confronted the defendant about whether he had touched Angelica, he "played dumb."

**5.** The residence is a shotgun-style house with the rooms front to back as follows: the living room, Angelica's bedroom, kitchen, bathroom, and the bedroom shared by Ms. Jones and the defendant.

**6.** Angelica often refuses to let her mother brush her teeth and as a result has poor dental hygiene.

evaluated by Dr. Christine Powanda, who, because she was in poor health, was unable to testify at trial. Dr. Salcedo conducted a second evaluation of Angelica in reference to Dr. Powanda's report.

Dr. Salcedo stated upon meeting Angelica, it was obvious that she had significant cognitive impairments and possibly suffered from cerebral palsy. He testified that Angelica is completely non-verbal, could only grunt or make noises, and was extremely childlike in her behavior.[7] Dr. Salcedo testified it was "impossible" for either he or Dr. Powanda to obtain a formal IQ score from Angelica because she did not have receptive language understanding or intact motor skills.[8] When asked by the prosecutor, he stated there was "no doubt" in his mind that Angelica had an IQ lower than 70. Dr. Salcedo also opined that he did not think it would be possible for anyone to properly administer an IQ test because of Angelica's severe level of cognitive impairment.

Tayla Pinell testified as an expert in the field of DNA analysis. She stated that all the swabs from both Mr. Castro and Angelica tested negative for seminal fluid. Ms. Pinell testified that the swab obtained from Angelica's left breast indicated that the defendant was the major contributor and the swab of Angelica's right breast showed him as the single DNA source. Ms. Pinell stated that the swab from the inguinal fold contained a mixture of DNA from three individuals and that Mr. Castro and Angelica were major contributors. The penile swab contained the DNA of three individuals: Mr. Castro, Angelica and Ms. Jones, all equally represented.

Ms. Pinell testified that primary transfer of DNA involves direct contact; secondary transfer occurs when one person's DNA is transferred to another person or object, even though the first person never came into contact with the other person or object. She stated that a lower level of DNA would be found through secondary transfer, and that, considering the high concentration of Mr. Castro's DNA found on Angelica's right breast, it was highly unlikely that the right breast swab would have contained transferred DNA. She also testified that it was possible that the right breast DNA was saliva due to the high level concentration.[9]

## II

In this Part, we turn to address Mr. Castro's claim of insufficient evidence.

### A

The standard of review applicable to sufficiency of evidence claims in criminal convictions is set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The *Jackson* standard is applicable to cases involving both direct and circumstantial evidence. *See State v. Nealy*, 450 So.2d 634, 636–37 (La. 1984); *State v. Lawrence*, 09–1637, p. 13 (La.App. 4 Cir. 8/25/10), 47 So.3d 1003, 1011. The inquiry requires a reviewing court to determine whether "after viewing the evidence in a light most favorable to the

---

7. Dr. Salcedo stated that when Angelica was young, she had a high fever which lasted six to eight hours and developed encephalitis which likely caused the developmental delay. Angelica continued to have seizures until she was approximately nine years old.

8. It appears from her report that Dr. Powanda attempted but was unable to conduct an IQ test. Dr. Salcedo admitted he did not even attempt to conduct an IQ test because of its futility. He did personally examine Angelica, however, and was thus able to form his own opinion of Angelica's IQ, in conjunction with Dr. Powanda's report. *Cf.* La. C.E. art. 701 *et seq.*; *State v. Mullins*, 14–2260, 14–2310 (La. 1/27/16), 188 So.3d 164.

9. The swab, however, was not tested for saliva.

prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781. *See also State v. Mussall*, 523 So.2d 1305, 1311 (La. 1988) ("If the court finds that no rational trier of fact viewing all of the evidence from a rational pro-prosecution standpoint could have found guilt beyond a reasonable doubt, the conviction cannot stand constitutionally.").

There are several key principles to a sufficiency review. First, we consider *all* of the evidence in the record, including evidence which may have been erroneously admitted at the trial, such as inadmissible hearsay. *See Jackson*, 443 U.S. at 319, 99 S.Ct. 2781; *State v. Hearold*, 603 So.2d 731, 734 (La. 1992).

Second, all the evidence is viewed in the light most favorable to the prosecution. *See State v. Clements*, 15–0630, p. 7 (La.App. 4 Cir. 5/4/16), 194 So.3d 712, 717. Thus, a reviewing court is not limited to the evidence itself, but may consider all reasonable *inferences* from the evidence which the fact-finder could have made. *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781; *Clements*, at p. 7, 194 So.3d at 717. Similarly, when circumstantial evidence forms the basis of a conviction, such evidence must consist of "proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience." *State v. Shapiro*, 431 So.2d 372, 378 (La. 1982). The essential elements must be proven in such a way that every reasonable hypothesis of innocence is excluded. *See* La. R.S. 15:438.

Third, in evaluating a sufficiency claim, we are restricted to those theories actually put forth by the defense at trial. *See State v. Juluke*, 98–341, pp. 4–5 (La. 1/8/99), 725 So.2d 1291, 1293 (per curiam). A defendant may not raise a new theory on appeal and demonstrate that the circumstantial evidence was insufficient to negate the new theory. *See id.*

Finally, as a reviewing court, we are highly deferential to the findings of the trier of fact. *See State v. Hamdan*, 13–0113, p. 10 (La.App. 4 Cir. 12/11/13), 131 So.3d 197, 204. The jury may thus accept as true the testimony of any witness, even a single witness, and find such testimony sufficient to establish each element of an offense beyond a reasonable doubt. *See id.* Our review will only impinge upon this fact-finding function to the extent necessary to assure compliance with *Jackson v. Virginia. See State v. Macon*, 06–481, p. 8 (La. 6/1/07), 957 So.2d 1280, 1285. Thus, we will *only* tread on a jury's presumed acceptance of a witness's testimony when that testimony is implausible or clearly contrary to the evidence. *See Mussall*, 523 So.2d at 1311; *see also Clements*, at p. 8, 194 So.3d at 717.

## B

Mr. Castro was convicted of *attempted* aggravated rape.[10] An aggravated rape, in relevant part, is "a rape committed upon a person ... where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because ... the victim is prevented from resisting the act because the victim suffers from a physical or mental infirmity preventing such resistance." La. R.S. 14:42 A(6). The statute defines a person with "mental infirmity" as one who has an intelligence quotient of seventy or below. La. R.S. 14:42 C(2). And, because Mr. Castro was convicted of attempted aggravated rape, the prosecu-

---

10. Since the date of this offense in 2013, the legislature amended the title of the statute from "aggravated rape" to "first degree rape." *See* 2015 La. Acts 184. All elements of the offense, however, were left unchanged.

tion had to prove that the defendant had the specific intent to commit an aggravated rape, demonstrated by an act "for the purpose of and tending directly toward" accomplishment of the offense. La. R.S. 14:27 A.

## C

■ Considering the foregoing, and construing the evidence in the light most favorable to the prosecution, we find that any rational trier of fact could conclude that Mr. Castro was guilty beyond a reasonable doubt of attempted aggravated rape.

First, it is clear that Angelica has a severe mental disability. She is completely non-verbal and cannot communicate in any coherent manner. She requires assistance with basic everyday tasks, such as bathing, getting dressed, and using the bathroom. Both Dr. Powanda and Dr. Salcedo were unable to administer an IQ test on Angelica because of her disability. Nevertheless, Dr. Salcedo testified that there was "no doubt" in his mind that Angelica had an IQ lower than 70. Moreover, the tests that were successfully administered scored Angelica within the "severe to profound deficit range." We find the evidence sufficiently proved that Angelica had an IQ of seventy or lower at the time of the offense.

The evidence demonstrates that in the short period that Ms. Jones was away, the defendant broke into Angelica's locked bedroom door. He moved Angelica into the back bedroom and, considering her personal-care limitations, likely assisted her to undress. Both he and Angelica were naked when discovered by Ms. Jones.

Mr. Castro's DNA was found on both of Angelica's breasts in high concentration. His DNA was likewise found on Angelica's inguinal fold as a major contributor. The victim's DNA was found on the defendant's penis. Mr. Castro asserted at trial that his DNA found on Angelica was the result of transfer, as opposed to contact, DNA. He claims on appeal that this reasonable hypothesis of innocence has not been excluded by the evidence. Ms. Jones, however, witnessed the defendant and victim naked together on the same bed where the defendant appeared to be "cleaning" or otherwise touching Angelica with the bed sheet. Further, the prosecution's expert in DNA analysis, Ms. Pinell, testified that although it is possible to transfer DNA, she did not believe it had occurred in this case because of the high concentration of Mr. Castro's DNA found on Angelica. We thus find that the evidence is inconsistent with Mr. Castro's theory of innocence.

It is true, as the defendant points out, that Ms. Jones was the only eyewitness testimony presented. He argues that certain inconsistencies in Ms. Jones's testimony and statements to police cast doubt on the credibility of her testimony.[11] Nevertheless, Mr. Castro acknowledges that the inconsistencies are not probative to the issue of whether an attempted aggravated rape had been committed. And, as it relates to the elements of the crime, Ms. Jones's testimony was not inconsistent and did not conflict with the physical evidence. *See State v. Marshall*, 04–3139, p. 9 (La. 11/29/06), 943 So.2d 362, 369 ("Absent internal contradiction or irreconcilable conflict with the physical evidence, a single witness's testimony, if believed by the fact finder, is sufficient to support a factual conclusion."). Clearly, the jury credited Ms. Jones's testimony and we see no reason to disturb its factual findings.

Moreover, the fact that no seminal fluid was detected in any of the tests is immate-

---

11. Specifically, Mr. Castro contends Ms. Jones was inconsistent about whether she went to work or the bank that morning, what tool was used to pry open Angelica's door, and who babysat Angelica when Ms. Jones occasionally left the house.

rial—to prove an attempt, the prosecution must only show that the defendant had specific intent to commit the aggravated rape and undertook an action tending directly towards accomplishing the crime. *See* La. R.S. 14:27 A. Neither penetration nor emission is required to sustain a conviction for attempted aggravated rape. *See* La. R.S. 14:41 B ("Emission is not necessary" to constitute the offense of rape); *see also, e.g., State v. Vargas–Alcerreca,* 12–1070, pp. 19–20 (La.App. 4 Cir. 10/2/13), 126 So.3d 569, 580–81; *State v. Crockett,* 583 So.2d 593, 598 (La. App. 4th Cir. 1991); *State v. Pennywell,* 13–1376, p. 21 (La. App. 3 Cir. 5/7/14), 139 So.3d 587, 600–01. Thus, the fact that the prosecution did not present any evidence of actual penetration does not render the evidence insufficient to support a conviction for attempted aggravated rape.

### CONCLUSION

We find that, viewed in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the prosecution proved all the essential elements of attempted aggravated rape. And, considering Ms. Jones's testimony and the DNA evidence presented by the prosecution, we find every reasonably hypothesis of innocence has been excluded.

### DECREE

We affirm the conviction of Daniel Castro.

**AFFIRMED**